IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 6949 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Claimant Charles M. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's application for a period of disability and Supplemental Security Income ("SSI") under the Social Security Act. 42 U.S.C. §§ 416(i), 402(e), and 423. The Commissioner has brought a cross-motion for summary judgment seeking to uphold the Social Security Agency's ("SSA") decision finding that Claimant is not disabled. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3). For the reasons stated below, Claimant's motion for summary judgment [17] is granted and the Commissioner's cross-motion for summary judgment [24] is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Charles M. as Claimant.

## I. BACKGROUND

### A. Procedural History

On December 18, 2014, Claimant filed a disability application alleging an onset date of June 10, 2010. His claim was denied initially and upon reconsideration. On October 25, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. After the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision. 20 C.F.R. § 404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action on October 16, 2018.

### B. Medical Evidence

#### 1. Evidence from Claimant's Treatment History

Claimant was a 62-year old attorney at the time of the ALJ's decision. Claimant alleges that he began experiencing disabling symptoms as of June 10, 2010 that included numbness extending from his upper abdomen to his feet. He also experienced impairments in his ability to control his bladder and bowels. (R. 760). Claimant saw his treating physician Dr. Scott Schieber on July 13, 2013 for his condition. (R. 519). Dr. Schieber referred him to specialists who diagnosed an arachnoid cyst at the T2-T3 level of the thoracic spine.[2] On August 27, 2013, neurologist Dr. Charles Cybulski carried out a T2-T4 laminectomy to treat Claimant's condition.[3] (R. 699-700). Dr. Cybulski noted improvement in Claimant's condition over the

---

[2] "Arachnoid cysts are cerebrospinal fluid-filled sacs that are located between the brain or spinal cord and the arachnoid membrane, one of the three membranes that cover the brain and spinal cord." https://www.ninds.nih.gov/Disorders/All-Disorders/Arachnoid-Cysts-Information-Page (last visited Oct. 3, 2019).

[3] "Laminectomy is surgery that creates space by removing the lamina – the back part of a vertebra that covers your spinal cord." https://www.mayoclinic.org/tests-procedureslaminectomy/about/pac-20394533 (last visited Oct. 3, 2019).

following months: he was able to mow his lawn as of October 25, 2013 and played golf at least once by January 9, 2014. (R. 839-40).

One of the symptoms that had accompanied the arachnoid cyst was spasticity in Claimant's legs. (R. 760). Dr. Cybulski noted that his gait was "markedly spastic" and that Claimant was unable to walk with any degree of stability prior to surgery. (R. 838). By May 14, 2014, Claimant still displayed spasticity and was prescribed the anti-spasmatic medications diazepam (Valium) and Baclofen to help with his symptoms. (R. 760-61). Claimant complained of drowsiness that resulted from the medications. (R. 760).

Claimant also experienced problems with his hands. An x-ray taken on September 17, 2014 of the left hand showed persistent flexion of the second and fifth fingers; mild to moderate degenerative changes in the fourth finger; and moderate degenerative changes in the first metacarpophalangeal joint. (R. 794). He was diagnosed with Dupuytren's disease, which involves a thickening of the fascia beneath the skin in the palms and fingers that pulls the fingers inwards. Claimant underwent a subtotal palmar fasciectomy on his small finger on October 2, 2014 with a release of the proximal interphalangeal joint and a subtotal palmar fasciectomy of the left ring finger. (R. 799). A second operation was done on January 29, 2015. (R. 796). A post-operative x-ray on February 3, 2015 showed an improved expansion of the fifth finger but an unchanged severe degenerative alteration of the first carpometacarpal joint. (R. 781).

### 2. Evidence From Treating and Consulting Physicians

On March 30, 2015, Dr. Dinesh Jain examined Claimant at the request of the SSA. Claimant told Dr. Jain that his gait and balance had improved since his spine surgery but he still experienced some imbalance. Dupuytren's contractions also created problems in using a keyboard. Dr. Jain's physical exam showed contractions in both little fingers and in the left ring

finger and thumb. Claimant demonstrated a normal gait and could get on and off the exam table without difficulty. He was able to tandem walk, walk on his toes and heels, squat, and hop on one leg. Dr. Jain noted that Claimant continued to have some pain in the upper thoracic region after his surgery and – despite the normal gait stated earlier – concluded that Claimant showed "some limitation of gait." He diagnosed a decrease in Claimant's focus and short-term memory and found that Claimant could sit for two to three hours, stand for one hour, walk four to six blocks, and lift or carry up to 40 pounds. (R. 732-34).

On March 31, 2015, psychologist Dr. Edward Klutcharch interviewed Claimant for the SSA. Claimant told Dr. Klutcharch that he could no longer work as an attorney due to problems in walking and retaining information. Dr. Klutcharch found that he was oriented to place and time; had an appropriate demeanor; and was properly dressed. No perceptual distortions or delusional thinking were noted. Dr. Klutcharch diagnosed Claimant with a major depressive disorder of moderate intensity and assigned a current GAF score of 48.[4] (R. 736-39).

Treating physician Dr. David Chen issued a report on Claimant's condition on January 20, 2016. Dr. Chen stated that Claimant suffered from incomplete paraplegia following the surgery on his arachnoid cyst. Claimant suffers from lower extremity weakness, impaired balance, and spasticity. He cannot stand or walk for six hours a day. In addition, Dr. Chen stated that the side effects of the medications that Claimant took to control spasticity would affect his attention and concentration. Combined with his neurological deficits, that could require Claimant to miss work "on occasion." (R. 478-82).

---

[4] GAF (global assessment of functioning) scores "reflect a clinician's assessment of a patient's overall functioning." *Mazzuca v. Colvin*, No. 12 C 2907, 2013 WL 1343344, at *3 n.1 (N.D.Ill. April 2, 2013). "[A] GAF score between 41 and 50 describes serious symptoms or any serious impairment in social, occupational, or school functioning." *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) (internal quotes and citation omitted).

Treating physician Dr. Schieber also met with Claimant on May 5, 2017 for the first time in over three-and-one-half years. He noted "a dramatic decline in functional status" for Claimant since he last saw him in July 2013. Dr. Schieber noted that Claimant had problems in walking due to balance issues and that he needed to take prescription pain medication daily to control his pain. Dr. Schieber found numbness and decreased sensation around the cervical thoracic region and hyperreflexic lower extremities. Like Dr. Jain, Dr. Schieber stated that Claimant could only walk for four blocks without severe pain. He can sit or stand for no more than 20 minutes at one time and can sit, stand, or walk for no more than two hours in an eight-hour day. Periods of rest would be necessary after walking for 60 minutes. Claimant could only lift or carry less than 10 pounds frequently and 20 pounds occasionally. Claimant would not experience "good days" and "bad days" and would need to be off work more than four days each month. (R. 1044-46).

### 3. Evidence From State-Agency Experts

On May 16, 2015, non-examining psychologist Dr. Lionel Hudspeth issued a report finding that claimant suffered from a non-severe affective disorder. Dr. Hudspeth assessed no restrictions in Claimant's ability to carry out activities of daily living ("ADLs") and mild limitations in his capacity for social functioning and in maintaining concentration, persistence, or pace. (R. 267). Dr. David Biscardi disagreed with that assessment on reconsideration by finding mild restrictions in all three of Claimant's functional areas. (R. 284).

### 4. Evidence From Claimant's Testimony

Claimant appeared at the July 20, 2017 hearing and gave testimony to the ALJ about his condition. He stated that he first sought medical treatment for his thoracic numbness after he had difficulty with his balance, gait, and bowel control. (R. 236). Claimant stated that the loss of his bowel control began in June 2010 and progressed to the point where he lost control once every

other day. (R. 237). Surgery for the thoracic cyst in August 2013 helped with his bowel problems but Claimant still had difficulty with balance after the operation. That included continuous spasticity with his legs as he lay in bed at night. Claimant was referred to Dr. Chen at the Chicago Rehabilitation Institute and was started on a protocol of drugs that included diazepam and Baclofen. (R. 241). Claimant stated that before starting those medications he fell down stairs frequently but now has greater control over his balance. He also takes four Norco tablets each day for pain. (R. 243-44). These medications cause side effects like drowsiness that cause Claimant to fall asleep while he is reading or watching TV. (R. 246).

  Claimant told the ALJ that he can stand for only 15 minutes and could walk for four blocks. He can lift up to 35 pounds but not on a regular basis. Claimant stated that after his hand surgery he had difficulty with fine manipulation like using zippers and buttons and would have problems typing on a keyboard. (R. 345-46). The medications also make it difficult for Claimant to concentrate. He described diminished concentration, slurred speech, and difficulty in typing to be the biggest barriers to his employment as a real estate attorney. (R. 249). Claimant told the ALJ that he still had an active bar membership and that he had done some legal work after his alleged onset date in June 2010. He described the scope of his legal work as very limited. Claimant helped his stepdaughter in a child custody matter, handled a contract issue for a friend, and was involved in one domestic relations issue. Claimant stated that he had not earned more than $4,000 a year from his legal work since June 2010. He keeps a webpage as an attorney but has not had any hits on it. (R. 230-32).

  Claimant also told the ALJ that his health insurance coverage fluctuated during the alleged disability period. He had insurance through his current wife's health plan or Medicaid from June 2013 through the date of the hearing. Although Claimant was not entirely clear on the

dates, he testified that he did not have insurance prior to that point because his former wife had dropped him from her health plan. (R. 236).

C. The ALJ's Decision

The ALJ issued a decision on October 25, 2017 finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity from his alleged onset date of June 10, 2010 through the last insured date of December 31, 2015. His severe impairments at Step 2 included a thoracic arachnoid cyst, status post-surgical resection and a Dupuytren's contracture of both hands. Claimant also suffered from the non-severe impairments of glaucoma, diabetes, and depression. As part of her finding the ALJ considered the Paragraph B factors for mental disorders.[5] Contrary to both of the state-agency psychologists, she found that Claimant had no limitation in his capacity for interacting with others. No restrictions were present in Claimant's ability to adapt or manage himself. He had mild limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace. None of these impairments met or medically-equaled a listing at Step 3, either singly or in combination. (R. 206-09).

Before moving to Step 4, the ALJ found that the medical record did not fully support Claimant's statements about the severity or frequency of his symptoms. She also weighed the reports of various physicians. The ALJ assigned great weight to state-agency experts concerning Claimant's physical and mental health. She dismissed the opinions of all the doctors who

---

[5] The listings contain three categories for evaluating mental impairments. The Paragraph B factors are used to assess a claimant's functional limitations. Because the ALJ's decision was issued on October 25, 2017, she correctly referenced the new paragraph B criteria that apply to claims filed on, or claims that were pending as of, January 17, 2017. *See* 81 Fed.Reg. 66,138 (Sept. 26, 2016). The old paragraph B factors addressed a claimant's (1) activities of daily living, (2) social functioning, (3) ability to maintain concentration, persistence, or pace, and (4) episodes of decompensation.

examined Claimant by giving little weight to the reports of Dr. Jain, Dr. Chen, Dr. Klutcharch, and Dr. Schieber. The ALJ then assessed Claimant's RFC by finding that he could perform medium work as that term is defined under 20 C.F.R. § 404.1567(c), except that he could only occasionally climb ladders, ropes, or scaffolding. Claimant could also frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs, and finger with the non-dominant left upper extremity. Based on these findings, the ALJ found at Step 4 that Claimant could perform his past relevant work as a real estate attorney. She therefore determined that he was not disabled without moving to Step 5.

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the

listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B.  Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the

courtlooks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the ALJ erred by (1) failing to accommodate his mental restrictions in the RFC, (2) incorrectly assessing his symptom testimony, (3) erroneously weighing the report of treating physician Dr. Schieber, and (4) failing to explain the RFC conclusion concerning Claimant's fine manipulation abilities.

### A. The ALJ Incorrectly Accounted for Claimant's Mental Restrictions

State-agency psychologists Dr. Hudspeth and Dr. Biscardi issued reports finding that Claimant's depression was not a severe impairment. As part of that conclusion, the psychologists agreed that Claimant had mild restrictions in his social functioning and in his ability to maintain concentration, persistence, or pace. They differed, however, on Claimant's ADLs: Dr. Hudspeth found no restriction; Dr. Biscardi assessed a mild limitation. The ALJ assigned great weight to both reports at Step 2. As noted above, *supra* at Section I(C) fn.5, the Paragraph B categories that are used for assessing the severity of mental impairments changed after these reports were issued. The ALJ applied the new factors at Step 2 to find that Claimant had mild restrictions in the area of understanding, remembering, or applying information and in his ability to maintain concentration. Contrary to both of the state-agency experts, the ALJ

concluded that no restriction existed in Claimant's social functioning – now called "interacting with others." She also found no restriction in the area of adapting, managing, or caring for oneself. (R. 208).

Claimant argues that the ALJ erred in finding that he did not have any limitation in interacting with others. The ALJ supported her finding by noting that Claimant shopped in stores, used social media daily, and socialized with family and friends. (R. 208). Taken at face value, these activities support some level of daily functioning.[6] Claimant clarified his statements, however, by telling the ALJ that he only joins family gatherings once or twice a month. (R. 453). Indeed, he otherwise avoids social activities, declines invitations, and tries not to interact with others because of his health and because the diazepam he takes for his spasticity causes him to slur his speech.[7] Claimant's wife confirmed Claimant's statements on these topics. (R. 249, 443, 454). The ALJ overlooked all of Claimant's qualifications about his social activities and relied only on those aspects of his testimony that bolstered her conclusion. That was erroneous because an ALJ cannot "cherry-pick facts that support a finding of non-disability

---

[6] Claimant stated that he uses Facebook daily. (R. 453). Although Claimant does not raise the issue, it is not entirely clear why the ability to engage in the virtual reality of social media supports a claimant's capacity for *actual* social interaction. Some courts have found in passing that it does. *See*, *e.g.*, *Stubbs-Pruitt v. Colvin*, No. 6:15-cv-309, 2016 WL 2594466, at *6 (D.Ore. May 5, 2016). The Court agrees that using social media might have some relevance to social functioning in the way that category was previously defined under the regulations: the "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at ¶ 12.00(C)(2) (2015). That included references to a diverse group of individuals such as grocery clerks, neighbors, landlords, and bus drivers. *Id.* The new regulations, however, focus more narrowly on a claimant's work setting: "This area of mental functioning refers to the abilities to relate to and work with supervisors, coworkers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App 1 at ¶ 12.00(E)(2) (2018). The relevance that using social media has to this description is less clear especially when, as here, the ALJ has no information about what the claimant's social media activity involves.

[7] The Commissioner states that Claimant's diazepam-related slurring was not relevant to the ALJ's analysis because diazepam was prescribed for Claimant's physical impairment and the ALJ was evaluating his mental condition. That overlooks that the ALJ herself cited Claimant's slurred speech in the Paragraph B analysis. (R. 208).

while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010).

The ALJ also failed to properly evaluate Claimant's limitation in understanding, remembering, or applying information. She found that Claimant had a mild limitation in this area because his ADLs showed that he "is independent in his personal care needs, prepares meals, drives, does household chores and laundry, takes care of household pets, [and] navigate[s] public transportation[.]" (R. 208). Contrary to this reasoning, the regulations do not identify a claimant's daily activities as part of this functional area. Rather, understanding, remembering, or applying information is defined as a claimant's "abilities to learn, recall, and use information to perform work activities" – functioning that includes:

> Understanding and learning terms, instructions, procedures; following one-or-two-step instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

20 C.F.R. § 404, Subpt. P, App. 1, ¶ 12(E)(1). The ALJ never explained why Claimant's ability to do laundry, care for pets, or bathe himself suggested that he could follow instructions or solve problems. Instead of ADLs, the ALJ should have considered what Claimant stated on this issue: he can only follow simple instructions; needs to take notes when given detailed directions; needs to read written instructions; and can only pay attention for five to ten minutes. (R. 454). The ALJ ignored everything that Claimant stated and, as before, was not entitled to disregard evidence that contradicted her finding that he had a mild restriction in remembering and applying information. *Denton*, 596 F.3d at 426; *see also Zurawski*, 245 F.3d at 888 ("It is worth repeating that an ALJ may not ignore an entire line of evidence that is contrary to her findings.") (internal quote and citation omitted).

That said, the ALJ's errors in assessing Claimant's mental functioning took place at Step 2. Mistakes that occur at that stage do not require remand when an ALJ finds that at least one severe impairment exists and proceeds with the sequential analysis beyond Step 2. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). That is because an ALJ may not disregard the impairments that were found to be non-severe at Step 2; rather, she must consider all of the claimant's impairments – severe and non-severe – throughout the decision and address the aggregate effect they have on the claimant's functioning. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2009). This general rule is particularly important when an ALJ assesses mental restrictions at Step 2. SSR 96-8p emphasizes that a Step 2 evaluation of the Paragraph B factors is not an RFC finding. Instead, "[t]he mental RFC assessment used at step 4 and 5 . . . requires a more detailed assessment [than the one used at Step 2] by itemizing various functions" related to the Paragraph B factors. SSR 96-8p, 1996 WL 374184, at *4 (1996).[8]

The ALJ recognized this directive at the end of her Step 2 analysis. Citing language that is frequently used in disability cases, she stated: "Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the '[P]aragraph B' mental function analysis." (R. 208). This language was clearly inadequate to satisfy the requirements of SSR 96-8p. The ALJ had to do more than discuss Claimant's mental restrictions in isolation at Step 2; she also had to consider them in combination with Claimant's other impairments at *all* stages of the disability analysis. For that reason, courts in this District have rejected statements identical to the ALJ's at Step 2 as insufficient to explain the effect that a claimant's mental

---

[8] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id*.

restrictions have on his or her ability to work. *See Alesia v. Astrue*, 789 F.Supp.2d 921, 933-34 (N.D.Ill. 2011) (stating that identical language "was not enough, because the combined impact of the impairments must be considered throughout the disability determination process") (citing 20 C.F.R. § 404.1523); *see also Charles B. v. Saul*, No. 18 C 1377, 2019 WL 3557055, at *5 (N.D.Ill. Aug. 1, 2019); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *23 (N.D.Ill. Nov. 18, 2011) (finding that the same language "fails to clarify the degree to which the RFC expresses the functional limitations found" at Step 2).

This does not mean that the ALJ was *required* to find that Claimant's mental restrictions necessitated an RFC accommodation. Given the fact-specific nature of impairments, a claimant may not need an accommodation to work full time even though a mental impairment limits aspects of the claimant's functioning. *See Simon-Leveque v. Colvin*, 229 F.Supp.3d 778, 787 (N.D.Ill. 2017). Even when that is the case, however, an ALJ is still obligated to explain why the record supports such a finding and may not rely on the language that the ALJ in this case used at Step 2. As many courts have found, remand is necessary when an ALJ fails to meet this requirement concerning a claimant's mental restrictions. *See*, *e.g.*, *McCulley v. Berryhill*, No. 13 C 6031, 2019 WL 1292982, at *5-6 (N.D.Ill. March 20, 2019); *Iora P. v. Berryhill*, No. 18 C 3640, 2019 WL 1112272, at *3 (N.D.Ill. March 11, 2019); *Jacqueline J. v. Berryhill*, No. 18 C 2401, 2019 WL 339588, at *4 (N.D.Ill. Jan. 28, 2019).

The ALJ may have thought that such a discussion was unnecessary because she stated at Step 2 that Claimant "currently maintains an active bar membership and represents individuals in his capacity as an attorney." (R. 208). The ALJ cited that fact to show that Claimant only had a mild limitation in his ability to maintain concentration. That seems doubtful at Step 2 and – more importantly – does not imply that Claimant did not need a mental RFC accommodation to

work full time. Claimant described a restricted range of legal work after his onset date. He told the ALJ that he only did real estate closings for family members; helped his brother with a traffic ticket; assisted his stepdaughter with a child custody issue; and never earned more than $4,000 a year since his alleged onset date. (R. 230-31). This is not substantial gainful employment, as the ALJ recognized. (R. 207). Even if this testimony were consistent with a mild restriction in concentration, persistence, or pace, therefore, it does not explain why Claimant did not need a mental RFC accommodation in order to work full time as an attorney.

In addition to addressing the effects of Claimant's restrictions in her decision, the ALJ was also required to incorporate any mental limitations that existed into the hypothetical questions posed to the VE. *See Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (stating that "the question must account for documented limitations of concentration, persistence, or pace") (internal quotes and citation omitted); *Visinaiz v. Berryhill*, 243 F.Supp.3d 1008, 1016 (N.D.Ind. 2017); *Koswenda v. Astrue*, No. 08 C 4732, 2009 WL 958542, at *5 (N.D.Ill. Apr. 2, 2009) (addressing mild restrictions). Contrary to that duty, the ALJ did not include any of the mental restrictions that she assessed in the questions that she asked the VE. Remand is therefore necessary so that the ALJ can properly consider the mental restrictions that Claimant has and explain their effect on his ability to work.

### B. Remaining Issues

Since this case already requires remand, the Court only briefly addresses two of Claimant's other grounds for remand.

#### 1. The ALJ Should Reevaluate Claimant's Symptom Testimony

The ALJ found that the record did not fully support the testimony that Claimant gave about the severity and frequency of his symptoms. She doubted his alleged exertional limits

because Claimant stated that he cared for his wife in 2010 when she suffered from breast cancer. (R. 210). Without more, that fails to undermine Claimant's symptom testimony because a claimant can be unable to work full time even though he cares for relatives. *See Mandella v. Astrue*, 820 F.Supp.2d 911, 925 (E.D.Wis. 2011). The record does not show what he did to help his wife, how long the care was needed, or what toll it took on Claimant. The ALJ could not draw any inferences about Claimant's ability to work in the absence of such information.

The ALJ also cited a range of daily activities that Claimant performed such as cooking, caring for his personal needs, and household tasks. She failed to note, however, that he only prepares sandwiches and salads and that it takes him up to two hours to do so. (R. 451). His shopping only consists of one to two trips to the store each week for only 30 minutes at a time. (R. 452). Claimant further stated that he could do "most chores" around the house but needed to take frequent breaks that the ALJ did not mention. (R. 451). The ALJ was required to account for what Claimant stated about his ADLs and to explain how carrying out such simple daily activities can be equated with the ability to work full time. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (noting that "critical differences" exist between daily activities and the less flexible demands of full-time work).

The ALJ also criticized Claimant because few medical records exist to confirm his alleged onset date as June 10, 2010. It is true that the record only contains sparse information for the first few years of Claimant's alleged disability period. He testified, however, that (1) his wife had breast cancer in 2010 and (2) she dropped him from her health insurance plan at some time prior to the time when he regained insurance in June 2013. The ALJ never asked Claimant how these facts might have restricted his ability to seek medical treatment at an earlier stage. *See Crawford v. Astrue*, 633 F.Supp.2d 618, 632 (N.D.Ill. 2009) ("[I]n order to draw an inference

about a claimant's condition, an ALJ must first consider the claimant's explanation for not seeking treatment.").

The ALJ further noted that Claimant played golf after his spine surgery. The Court agrees that the ability to play golf is inconsistent with the exertional limitations that Claimant described. That said, the record shows only one instance of playing golf during Claimant's five-and-one-half year disability period. (R. 840). SSR 16-3p stresses that "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time." 2017 WL 5180304, at *9 (2017). On remand, the ALJ should consider that requirement and apply the other factors set out in SSR 16-3p to evaluate Claimant's symptom testimony with greater care.

## 2. The ALJ Should Reconsider Dr. Schieber's Report

The ALJ had reports about Claimant's physical and mental condition from four examining or treating doctors: Dr. Scheiber, Dr. Chen, Dr. Klutcharch, and Dr. Jain. Each of these experts thought that Claimant was more limited than the ALJ concluded. She dismissed the findings of all the experts who examined Claimant, however, and assigned great weight to the non-examining state-agency doctors. The regulations advise ALJs that they should generally "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). An ALJ is not required to do so in all cases but must explain the basis of his or her reasoning with care.

The ALJ's dismissal of Dr. Schieber's report does not meet this standard. She discounted his opinion because Dr. Scheiber stated that Claimant was disabled and, as the ALJ noted, such findings are reserved to the Commissioner. This reasoning is misplaced because the report does not make the claim that the ALJ attributed to it. Dr. Scheiber stated in a May 1, 2017 treatment note that Claimant "is permanently disabled for all occupations," (R. 1041), but his *report* does

not include such a statement. The ALJ also criticized the report because Dr. Scheiber is a general practitioner. As Claimant points out, however, the ALJ credited the state-agency experts Dr. Hinchen – a general practice physician – and Dr. Bilinsky who is a nephrologist with no specialized knowledge about Claimant's condition. The ALJ failed to explain why the lack of specialized medical knowledge worked against Dr. Scheiber's report but did not apply to the state-agency reports. Unlike the non-examining experts, by contrast, Claimant told the ALJ that he had been seeing Dr. Scheiber for 30 years. That made Dr. Scheiber far more familiar with Claimant's longitudinal condition than any other medical source.

The ALJ further believed that the report was less credible because it was issued after the close of Claimant's disability period on December 31, 2015. The fact that a medical exam takes place after the close of a disability period does not automatically make it irrelevant to a pre-existing condition. *See Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) (describing such a finding as legal error). Rather, the ALJ should consider how the exam's findings relate to the claimant's status during the disability period. *See Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008); *see also Bird v. Comm. of Soc. Sec.*, 699 F.3d 337, 340-41 (4th Cir. 2012). The ALJ did not do so in this case.

Finally, the ALJ dismissed Dr. Scheiber's report because the doctor stated that it was made with the "input" of Claimant. (R.1041). The ALJ construed that to mean that the report was impermissibly based on Claimant's subjective allegations. An ALJ is entitled to discount a treating source opinion on that basis. *Ephrain S. v. Berryhill*, 355 F.Supp.3d 738, 746 (N.D.Ill. 2019). Without further inquiry, however, the ALJ had no knowledge of what Claimant's "input" for the report involved. Dr. Scheiber did not elaborate on this issue, and the ALJ did not ask Claimant to describe what he told his treating physician. For all the ALJ knew, Dr. Scheiber's

RFC findings were based on the kind of symptom descriptions that any patient is required to make to a doctor in order to receive treatment. Remand is therefore necessary so that the ALJ can articulate her assessment of Dr. Schieber's report with greater accuracy.

## IV. CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [17] is granted. The Commissioner's cross-motion for summary judgment [24] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) reassess the limitations that stem from Claimant's depression, (2) restate the reasons for the symptom evaluation, (3) explain with greater care what accommodations, if any, are needed to account for Claimant's mental impairment, and (4) restate the reasons for the weight given to Dr. Schieber's report.

                                                     **Jeffrey Cummings**
                                                     **United States Magistrate Judge**

**Dated: January 15, 2020**